## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SANDI GUTIERREZ,

                Plaintiff,

v.                                     Civ.  No. 03-0759 JCH/RLP

TOWN OF LOGAN, PAUL HARE,
Chief of Police of Logan, and GREG
GREENLEE, Logan Police Officer,

                Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants' Motion and Memorandum in

Support of Motion for Summary Judgment, filed July 6, 2005 **[Doc. No. 48]**.  The Court having

considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the

Motion is well taken in part and shall be granted in part.

## BACKGROUND

On August 26, 2000, a Saturday night, at approximately 9:45 p.m., Defendant Officer

Greg Greenlee of the Logan Police Department and Officer Rigoberto Chavarria of the New

Mexico State Police responded to a domestic disturbance call.  The call was placed from the

residence that Plaintiff Sandi Gutierrez shared with her spouse Patrick Gutierrez, who was a

police officer with the Tucumcari Police Department.  Shortly thereafter, Defendant Paul Hare,

the Chief of Police of the Logan Police Department, arrived on the scene.  Defendants Greenlee

and Hare were aware that Mr. Gutierrez was a police officer.

The parties do not dispute that upon the arrival of Defendant Greenlee and Officer

Chavarria, Plaintiff was obviously upset with her husband and visibly shaken.  Officer Chavarria described Plaintiff as crying and hysterical.  Defendant Greenlee testified that Plaintiff indicated that her husband had "gone off the deep end," that "he was crazy," and that "he was swinging a shovel, [and] broke the windows to the vehicles out."  Defendant Greenlee inspected the two damaged vehicles on the property and both he and Officer Chavarria observed broken windows on the vehicles.  Officer Chavarria also observed damage to the body of one of the vehicles.

Plaintiff did not accuse her husband of physical contact against her.  Defendant Greenlee testified that he asked Plaintiff whether Patrick Gutierrez hit her or whether she was in fear of Mr. Gutierrez hitting her, and Plaintiff responded in the negative.  Neither Defendant Greenlee nor Officer Chavarria testified that Plaintiff informed them of where she was while Patrick Gutierrez broke the windows in the cars.  Plaintiff Gutierrez testified that she was in one of the cars when her husband used a shovel to smash the glass onto her.  Plaintiff, however, cites no evidence in the record indicating that she informed Defendant Greenlee or Officer Chavarria of this fact or that they were aware that she was in one of the vehicles when her husband smashed the windows.

Officer Chavarria testified that he considered the scene to be a domestic violence scene based upon the appearance and demeanor of Plaintiff, the damage to the vehicles, and Plaintiff's statements that Patrick Gutierrez was "at it again."  Officer Chavarria testified that domestic violence need not consist of a physical battery.

Thereafter, Defendant Greenlee, followed by Officer Chavarria, entered the residence and walked down a hallway towards the bedroom.  Officer Chavarria testified that as soon as Defendant Greenlee turned into the bedroom, he jumped back, literally into Officer Chavarria's arms, and yelled to Patrick Gutierrez, "Don't point the gun at me."  Officer Chavarria testified

that he drew his weapon because Officer Chavarria did not know whether Mr. Gutierrez was going to utilize the weapon that Defendant Greenlee had indicated he was holding.  Officer Chavarria testified that Defendant Greenlee ordered Mr. Gutierrez to put the weapon down, but that based upon Defendant Greenlee's continued attempts to get Mr. Gutierrez to surrender the weapon, it was clear Mr. Gutierrez was not following Defendant Greenlee's orders.  According to Officer Chavarria, Defendant Greenlee asked Officer Chavarria to speak to Mr. Gutierrez while he went outside to put on his "protective vest."  Officer Chavarria already was wearing a protective vest.  Officer Chavarria still had his weapon drawn, at a low ready point.

After Defendant Greenlee left, Officer Chavarria observed Mr. Gutierrez sitting on the bed, hunched over, with his weapon near his side.  Officer Chavarria testified that Mr. Gutierrez kept "lifting [his weapon] up," which was pointed at Officer Chavarria, and telling Officer Chavarria to "f*** off and to get out of his house."  Officer Chavarria attempted to persuade Mr. Gutierrez to put his weapon away.  Mr. Gutierrez indicated that if Officer Chavarria was going to take him in, he would go, but that if Officer Chavarria tried to "pull any tricks on him, to bring it on."  Other officers arrived on the scene and also were attempting to persuade Mr. Gutierrez to surrender his weapon.  Officer Chavarria testified that Mr. Gutierrez kept the muzzle of his gun pointed at the officers during the entire encounter, and that Mr. Gutierrez kept lifting the gun up and telling the officers to "get out of his damn house."  Officer Chavarria pleaded with Mr. Gutierrez, and it crossed his mind that he might have to shoot Mr. Gutierrez.

Officer Chavarria testified that because Mr. Gutierrez was barricaded inside of the bedroom, he summoned additional units to set the inner and outer perimeters and clear the area. Defendant Greenlee, while outside, also summoned the Tucumcari Police Department for their

SWAT Team, and then, after putting his protective vest on, returned inside the residence, where he continued to try to persuade Mr. Gutierrez to put down his weapon.

Officer Chavarria testified that he and Defendant Greenlee finally convinced Mr. Gutierrez to holster the weapon. Thereafter, Mr. Gutierrez walked towards Defendant Greenlee and Officer Chavarria. Officer Chavarria testified that he looked at Defendant Greenlee, to question whether they were going to detain Mr. Gutierrez at that time, and Defendant Greenlee made a motion with his hand and nodded his head to indicate "no." Officer Chavarria assumed that Defendant Greenlee was going to wait until they were in the living room to detain Mr. Gutierrez. Defendant Greenlee, however, did not do so. Officer Chavarria testified that he was surprised by Defendant Greenlee's decision, and that, given Mr. Gutierrez's erratic mood swings, it would have been wise, and his wish, to detain Mr. Gutierrez at that time. Officer Chavarria obtained Mr. Gutierrez's weapon, which had been fully loaded the entire time, and unloaded it.

Officer Chavarria testified that Mr. Gutierrez was intoxicated, and that he could smell the odor of alcohol on him. Officer Chavarria also noticed Mr. Gutierrez's slurred speech and bloodshot and watery eyes. Despite the fact that Mr. Gutierrez was visibly intoxicated, the officers on the scene allowed him to walk to his refrigerator, take out a beer, and drink it. Officer Chavarria testified that he was surprised, and that he believed that because Mr. Gutierrez already was intoxicated, more alcohol would exacerbate his extreme behavior. Defendant Greenlee indicated that he believed it was appropriate to allow Mr. Gutierrez to have a beer, because Mr. Gutierrez had "exhibited no aggressive behavior towards [Defendant Greenlee]" and "no aggressive behavior at that time towards anybody in that house." Defendant Greenlee testified that sometimes alcohol can have a "sobering" effect on a person or "cool[] people down."

4

Thereafter, Defendants Greenlee and Hare agreed not to arrest Patrick Gutierrez. Officer Chavarria testified that he disagreed with this decision. Had it been his case, Officer Chavarria indicated that he would have arrested Mr. Gutierrez for any number of crimes, including negligent use of a firearm, disorderly conduct, and aggravated assault with a deadly weapon. Officer Chavarria informed Defendant Greenlee that he believed they should arrest Mr. Gutierrez. According to Officer Chavarria, Defendant Greenlee informed Officer Chavarria that it was not Officer Chavarria's case; Defendant Hare similarly indicated that he was the chief of police, and that he and Defendant Greenlee would handle the situation. Officer Chavarria testified that Defendant Hare made rude remarks towards him, such as that he and Defendant Greenlee were not state police, that they were not as intelligent as state police, that they were not as well trained as state police, but that Defendant Hare was nonetheless the chief of the Logan police and that he and Defendant Greenlee would handle the case. Defendants Greenlee and Hare maintain that they based their decision not to arrest either of the spouses involved in the domestic disturbance on the fact that neither spouse had physically harmed the other and because they determined that the situation had been diffused, provided that Plaintiff spent the night in a separate residence.

The officers believed that Plaintiff would be spending the night at her aunt's house. While the officers were attempting to persuade Mr. Gutierrez to surrender his weapon, Defendant Greenlee testified that he "told" Plaintiff to "[j]ust leave, go over to your neighbor's house, let us deal with the situation." Defendants maintain that they asked Plaintiff to, and hoped that she would, spend the night at her aunt's house. Plaintiff claims that she was ordered to spend the night at her aunt's house. Plaintiff did not have an ownership interest in her aunt's house.

After the law enforcement officials left the scene, Plaintiff decided to return to her house

5

to determine the resolution of the incident involving her husband.  Thereafter, 911 dispatch received a call to return to the Gutierrez residence.  Defendants Greenlee and Hare returned to the scene together in the same police unit.  After speaking with both Plaintiff and Patrick Gutierrez, the parties agreed that Plaintiff would return to her aunt's house for the night and that Patrick Gutierrez would move out in the morning.  Patrick Gutierrez asked Defendant Greenlee to retrieve his wallet, which Plaintiff had taken to her aunt's house.  The wallet contained Patrick Gutierrez's driver's license and police certification card, as well as some cash.  Defendant Hare testified that Plaintiff "was told the money is community property" and that "she can have the money, but [Patrick Gutierrez] needs his wallet."

Defendant Hare remained with Patrick Gutierrez while Defendant Greenlee proceeded with Plaintiff to Plaintiff's aunt's residence to retrieve the wallet.  According to Defendant Greenlee, he gained entrance to the living room of Plaintiff's aunt's house by "knock[ing] on the door and enter[ing]."  When asked if Plaintiff invited him in, Defendant Greenlee testified, "I don't recall any conversation as far as that is concerned."  Defendant Greenlee further testified, "Well, they never told me not to enter and, you know, I don't--they may have said come in when I knocked on the door, sir, I don't recall, I'm sorry."

Once inside of the residence, Defendant Greenlee maintains that Plaintiff changed her mind about returning the wallet to her husband.  Defendant Greenlee claims that when he informed Plaintiff that the police certification documents were not her property, a struggle over the wallet ensued.  According to Defendant Greenlee, Plaintiff struck him and pushed him, and resisted his efforts to subdue and handcuff her.  Defendant Greenlee maintains, and Plaintiff does not dispute, that during the struggle, Plaintiff was using profanity and verbally questioning Defendant Greenlee

6

with respect to his decision to arrest her.  Defendant Greenlee also maintains that Plaintiff physically struggled with him after he informed her that she was under arrest.  Defendant Greenlee further testified that Plaintiff's resistance to the arrest and use of profanity continued while he took Plaintiff to his police vehicle.

Plaintiff denies that she changed her mind about returning the wallet.  Plaintiff maintains that she was going to return the wallet, minus the money.  Plaintiff does not deny that a struggle ensued.  Plaintiff does however dispute how the struggle originated.  Plaintiff testified that she and Defendant Greenlee approached her aunt's house to obtain her husband's wallet minus the cash. According to Plaintiff, Defendant Greenlee escorted Plaintiff onto her aunt's porch.  Plaintiff testified that she entered the residence by herself, shut the screen door behind her, and instructed Defendant Greenlee to "[w]ait right here, and I'll go get it for you."   Although Plaintiff maintains that she shut the screen door, she testified that Defendant Greenlee then held the door open. Defendant Greenlee, according to Plaintiff, watched Plaintiff walk two to three feet inside of the residence to a table on which the wallet lay.  Plaintiff, who was facing away from Defendant Greenlee, opened the wallet to remove the cash.  Defendant Greenlee, Plaintiff maintains, told her to hand the entire wallet over, and Plaintiff indicated that she was going to remove the cash. According to Plaintiff, Defendant Greenlee stepped inside of the residence, to the back left of Plaintiff, and grabbed the walled from Plaintiff.  Plaintiff testified that her "natural instinct was to hold onto [the wallet]," and that as Defendant Greenlee "pull[ed the wallet], [her] hands [went] with it, and [she] brushed his shoulder."  Defendant Greenlee then stated, "Battery on an officer. You are under arrest."

Plaintiff testified that she was in "complete and utter shock, the shock of [her] life, and

7

that she repeatedly asked him, "Why are you arresting me," "How can you do this," and "You know I didn't hit you." Plaintiff testified that she did not try to move away from Defendant Greenlee after he told her she was under arrest. She "stood right where he was at, asking him why he was arresting [her]." Plaintiff also testified that Defendant Greenlee, after saying "You're under arrest," "didn't vocalize anything" but "immediately threw [her] down" to the ground and tried to handcuff her. According to Plaintiff, she and Defendant Greenlee "flop[ped] around like fish for a while." Plaintiff admits that once Defendant Greenlee threw her to the floor, she was "trying to get away from him as far as get upright, vertical, and off the floor." Thereafter, when Defendant Greenlee got Plaintiff to stand up, Plaintiff testified that he handcuffed her and "drag[ged]" her out of the residence, down the steps, and down the street to his police vehicle, which was parked in front of Plaintiff's (and not her aunt's) house. Plaintiff maintains that she was not "tussling" with Defendant Greenlee or otherwise resisting arrest as he dragged her "as fast as he could go" from her aunt's house down the street to his police vehicle. Thereafter, Defendant Greenlee placed Plaintiff in his vehicle.

Plaintiff testified that her aunt, her cousin, and her two children saw the struggle. They were standing outside of her aunt's house, on or near the porch. Plaintiff testified that her aunt was outside of the house because, she "believe[d] [Aunt Ruby] just came outside to open the door, you know, to let us in, and then was just standing there and hadn't entered the residence."

Defendant Greenlee reported to Defendant Hare that Plaintiff unlawfully had touched him and had committed a battery upon him. Defendant Greenlee also informed Defendant Hare that he arrested Plaintiff for the crime of battery on a peace officer. During the time that Defendant Hare was Chief of Police of the Logan Police Department, Defendant Hare had not been involved

in any experiences with Defendant Greenlee that would have lead him to believe that Defendant Greenlee's report was less than accurate or truthful.[1]

Defendants Greenlee and Hare took Plaintiff back to the Logan Police Department.  At the station, Defendant Greenlee sat Plaintiff in a chair and asked her questions.  Plaintiff continued to ask Defendant Greenlee "why [he was] doing this."  Plaintiff testified that Defendant Hare approached her and said, "Honey, if you don't shut that sweet little mouth of yours now, we can just continue to add on more charges.  So you best comply and answer all the questions."  At that point, Plaintiff testified that it was clear that Defendants Greenlee and Hare were against her and she stopped talking.  Thereafter, Defendant Greenlee took Plaintiff to the detention center.  Defendants concede that Defendant Hare's name is on certain documentation as Plaintiff's arresting officer.

The parties do not dispute that Plaintiff was released from custody on Monday morning, August 28, 2000, and that the District Attorney decided not to press charges against Plaintiff.  The parties also do not dispute that Plaintiff sustained bruises and lacerations as a result of the struggle.

Defendant Hare did not have final hiring or firing authority at the Logan Police Department, and could only make recommendations to the Town of Logan Council with respect to hiring and firing.  At the time of the incident in August 2000, Defendant Hare was in the process of rewriting the Logan Police Department's standard operating procedures (SOPs).

---

[1] Although Plaintiff denies this fact, and states that "Greg Greenlee had multiple problems at agencies where he had worked," Plaintiff provides no cite to any specific evidence substantiating this claim or indicating that Defendant Hare was aware of the alleged problems involving Defendant Greenlee on August 27, 2000.

Although Defendants maintain that in order for the procedures to become effective, the Town of Logan Council would have to adopt the proposed SOPs as procedure, Defendants do not provide support for this assertion.

## STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997). "'Instead, the movant only bears the initial burden of 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo v. Neighborhood Health*

*Centers, Inc.*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a suit under 42 U.S.C. Section 1983. Qualified immunity bars Section 1983 suits against defendants in their individual--but not official-- capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989)).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2)

demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).   When a constitutional claim of excessive force is brought against a law enforcement officer, the first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officer's conduct violated a constitutional right. *Cf. id.* at 201.  The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.2d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity.  *See Medina*, 252 F.2d at 1128.  If the nonmoving party, however, successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted), *cert. denied*, 509 U.S. 923 (1993).

## DISCUSSION

Defendants move for summary judgment on several grounds.  First, with respect to Plaintiff's Fourth Amendment unlawful search claim, Defendants Greenlee and Hare argue that no search occurred.  Defendant Greenlee further maintains that qualified immunity protects him because Plaintiff has not alleged facts stating a constitutional violation.  Second, with respect to the Fourth Amendment unlawful seizure claim, Defendant Greenlee argues that Plaintiff has not stated a constitutional violation on the facts alleged.  Defendant Hare maintains that he was not present during the arrest of Plaintiff and that he did not participate in the decision to arrest Plaintiff.  In the alternative, Defendant Hare argues that if the Court finds that he was personally involved, he properly relied upon Defendant Greenlee's description of the events leading up to the arrest.  Third, with respect to Plaintiff's Fourth Amendment excessive force claim, Defendant Greenlee argues that qualified immunity protects him because the facts do not demonstrate that the force he used was unreasonable under the circumstances.  Defendant Hare contends that he is entitled to summary judgment because there is no evidence that he used any force against Plaintiff.  Fourth, with respect to Plaintiff's Fourteenth Amendment equal protection claim based upon the failure to arrest Patrick Gutierrez and subsequent arrest of Plaintiff, Defendants maintain that they are entitled to summary judgment in their favor because Plaintiff did not suffer any harm from Patrick Gutierrez as a result of their decision not to arrest him.   Finally, with respect to Plaintiff's municipal liability claims, Defendants Town of Logan and Hare in his official capacity argue that they are entitled to summary judgment because Plaintiff has failed to demonstrate the existence of a policy or custom and has failed to demonstrate deliberate indifference.  The Court will address each of these arguments in turn.

13

I.      Section 1983 Fourth Amendment Unlawful Search Claim.

      A.      Defendant Greenlee.

           1.      Constitutional Violation.

Plaintiff alleges that Defendant Greenlee unlawfully searched Plaintiff in violation of the Fourth Amendment, and that she therefore is entitled to relief under 42 U.S.C. Section 1983. Section 1983 provides civil redress for deprivation of constitutional rights by persons acting under color of state law. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995).[2]  Section 1983 was enacted "to provide protection to those persons wronged by the misuse of power." *Owen v. City of Independence*, 445 U.S. 622, 650 (1980) (citations omitted).

Defendant Greenlee in his individual capacity[3] has raised a qualified immunity defense, and the Court therefore must evaluate the merits of the defense under the modified summary judgment standard that applies to public officials who assert qualified immunity. *See, e.g.*, *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996).  To determine whether Plaintiff has satisfied the first part of her burden under this standard by establishing a constitutional violation on the facts alleged by Plaintiff, the Court must look to the substantive law in effect at the time the conduct in question occurred. *See Saucier v. Katz*, 533 U.S. 194, 199 (2001).  Because "Section 1983 creates no substantive civil rights, but rather only a procedural mechanism for enforcing them,"

---

[2] Section 1983 provides in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.

[3] Qualified immunity protects government officials sued in their individual, but not official, capacities.  *See Hafer v. Melo*, 502 U.S. 21, 24 (1991).

14

the Court's analysis must focus on the alleged violation of the Fourth Amendment.[4]  *See Wilson*, 52 F.3d at 1552 (citation omitted); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

With respect to Plaintiff's Fourth Amendment unlawful search claim, Defendant Greenlee first argues that Plaintiff cannot state a violation of the Fourth Amendment because Plaintiff's aunt gave him permission to enter the home.  In his motion, Defendant Greenlee claims that "[w]hen [he and Plaintiff] arrived at the house, together, [Plaintiff's aunt] held the door open for both of them."  Defendant maintains that Plaintiff admitted as much in her deposition, and that this admission is proof that he was invited into the home by the home owner.  The "proof" Defendants refer to  is Plaintiff's answer to the question, "Do you know why [your aunt is] outside of her house."  Plaintiff responds, "I believe [my aunt] just came outside to open the door, you know, to let us in, and then was just standing there and hadn't entered the residence."  Plaintiff's testimony is not necessarily "proof" that Plaintiff's aunt invited Defendant Greenlee into her home.  In addition, Plaintiff had just earlier testified that Defendant Greenlee had "escort[ed]" her up to the porch, that she alone had "enter[ed] the residence . . . and shut the door behind [her]," and that she had told him "[w]ait right here, and I'll go get it for you."

Defendant Greenlee also testified that he gained entrance to the living room by "knock[ing] on the door and enter[ing]."  When asked if Plaintiff invited him in, Defendant Greenlee admitted, "I don't recall any conversation as far as that is concerned, sir."  Defendant Greenlee in fact stated that his understanding of the law is that an officer "ha[s] to have consent or a legal reason to be inside [of a] residence."  Defendant Greenlee further testified, "Well, they

---

[4] The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. Amend. IV.

never told me not to enter and, you know, I don't -- they may have said come in when I knocked

on the door, sir, I don't recall, I'm sorry."   The Court concludes that, on the facts alleged by

Plaintiff, Defendant Greenlee did not have consent to enter the residence.

Defendant Greenlee next argues that even if he did not have consent to enter, Plaintiff

cannot state a constitutional violation because she had no reasonable expectation of privacy

standing two to three feet inside of the home with a screen door separating her from him.   In

*Payton v. New York*, the Supreme Court held that an officer's physical act of crossing the

threshold of a home without consent, exigent circumstances, or a warrant constituted an unlawful

search in violation of the Fourth Amendment.   *See* 445 U.S. 573, 576 (1980).   The *Payton* Court

stated, "In terms that apply equally to seizures of property and to seizures of persons, the Fourth

Amendment has drawn a firm line at the entrance to the house.   Absent exigent circumstances,

that threshold may not reasonably be crossed without a warrant."   *Id.*

According to Defendant Greenlee, however, because Plaintiff was "standing just inside the

doorway," Plaintiff had no reasonable expectation of privacy and therefore no Fourth Amendment

protection.   In support of his contention, Defendant Greenlee cites *McKinnon v. Carr*, a Tenth

Circuit case holding that a warrantless arrest at a suspect's doorway does not violate the Fourth

Amendment.   103 F.3d 934 (10th Cir. 1996).   In *McKinnon*, the Tenth Circuit observed, "[T]he

suspect was visible, standing in the threshold of his doorway, open to public view.   He was in a

place sufficiently public that he had no legitimate expectation of privacy.   The officers had

knocked, identified themselves, neither displayed nor threatened violence, and the defendant had

opened the door."   *Id.* at 935-36.   Drawing an analogy, Defendant Greenlee argues that Plaintiff

was in the same situation because she was standing "just inside the doorway" and "her Aunt and

children, who were standing outside, saw all of the events unfold; therefore, she had no expectation of privacy standing just inside the doorway where she had the altercation with Officer Greenlee."

*McKinnon*, however, is distinguishable from the case at bar.  In *McKinnon*, officers did not observe Mr. McKinnon two to three feet inside of a residence through a screen door, after being instructed to wait outside.  Rather, Mr. McKinnon opened the door and stood in the threshold of his doorway in plain view of the officers.  One of the officers told Mr. McKinnon that he was under arrest.  At the doorway, with no barrier at all between him and the officers, the *McKinnon* court held that Mr. McKinnon had no legitimate expectation of privacy and therefore that no unlawful seizure had occurred in violation of the Fourth Amendment.  The *McKinnon* court emphasized the fact that the arrest occurred "at" the doorway.  *Id.* at 935 ("The district court did not err in holding that the arrest at the doorway was not invalid."); *see also id.* ("the suspect was visible, standing in the threshold of his doorway, open to public view").

Here, in contrast, the arrest did not occur "at" Plaintiff's doorway.  Plaintiff had entered the house and was standing two to three feet inside of the doorway.  Plaintiff had shut the screen door behind her and had specifically told Defendant Greenlee to "[w]ait right here," outside of the door to the house.  Plaintiff testified that her back was to Defendant Greenlee as she was opening the wallet and removing the cash.  Defendant Greenlee admitted that he opened the screen door and does not remember receiving permission to do so.  Defendant Greenlee nonetheless entered the residence, without Plaintiff's consent, and approached Plaintiff, who had her back to him.  The Court holds that on the facts alleged by Plaintiff, Plaintiff had a reasonable expectation of privacy, standing two to three feet inside of her door, with her back to Defendant Greenlee, and with a

screen door separating her from Defendant Greenlee, and having instructed Defendant Greenlee
to remain outside.

Defendant Greenlee's argument that Plaintiff had no reasonable expectation of privacy
inside of her doorway where the altercation took place because Plaintiff's aunt and her children
witnessed the struggle between he and Plaintiff does not persuade the Court otherwise.  Although
Plaintiff's aunt and children may have witnessed the struggle, there is no evidence that Plaintiff
held her act of getting her husband's wallet and removing the cash out to public view.  These acts
occurred prior to Defendant Greenlee's unlawful entrance into the home.  Before getting the
wallet, Plaintiff specifically instructed Defendant Greenlee to remain outside of the home.  Plaintiff
shut the screen door.  Plaintiff approached the wallet with her back to Defendant Greenlee.
Plaintiff removed the cash from the wallet with her back to Defendant Greenlee.  It is clear, on the
facts alleged by Plaintiff, that Plaintiff did not knowingly expose the wallet or herself to public
view.  *Compare Katz  v. United States*,  389 U.S. 347, 351 (1967) ("What a person knowingly
exposes to the public, even in his own house or office, is not a subject of Fourth Amendment
protection."); *see also United States v. Santana*, 427 U.S. 38, 42 (1976) (noting that where one is
standing at her doorway, "not merely visible to the public but . . . exposed to public view, speech,
hearing, and touch as if she had been standing completely outside her house," that person has no
reasonable expectation of privacy) (citations omitted).  Accordingly, Plaintiff had a reasonable
expectation of privacy in the home in which she was an overnight guest.

Because Plaintiff had a reasonable expectation of privacy, Defendant Greenlee needed a
legal reason or permission to enter the home.  The evidence does not indicate that Defendant
Greenlee had a warrant to search or enter Plaintiff's home.  *See Minnesota v. Dickerson*, 508 U.S.

366, 372 (1993) (a warrantless search is presumptively unreasonable). The facts as alleged by

Plaintiff do not indicate that Defendant Greenlee had permission to enter the home. Moreover,

the fact that Plaintiff allegedly committed battery on a peace officer cannot justify Defendant

Greenlee's entry into the home because the facts substantiating that allegation arose after

Defendant Greenlee entered the home.[5] The Court therefore holds, on the facts alleged by

Plaintiff, that Plaintiff has stated a constitutional violation on her unlawful search claim.

2.    <u>Clearly Established</u>.

Because the Court has held that the facts alleged by Plaintiff establish a constitutional

violation, the Court must consider next whether the right violated was clearly established. *See*

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). "'[T]he right [Defendants are] alleged to have

violated must have been 'clearly established' in a more particularized, and hence more relevant,

sense: The contours of the right must be sufficiently clear that a reasonable official would

understand that what he [or she] is doing violates that right.'" *Id.* (quoting *Anderson v.

Creighton*, 483 U.S. 635 (1987)). Therefore, "the relevant, dispositive inquiry in determining

whether a right is clearly established is whether it would be clear to a reasonable officer that his

[or her] conduct was unlawful in the situation . . . confronted." *Id.* (citing *Wilson v. Layne*, 526

U.S. 603, 615 (1999)). Under this test, even if a defendant were mistaken in believing a search

was lawful or that probable cause to arrest a plaintiff existed, the defendant may be entitled to

---

[5] Defendant Greenlee cannot justify his entrance into the home by claiming that he had probable cause to arrest Plaintiff for a crime. On the facts as alleged by Plaintiff, Plaintiff was not a suspect that Defendant Greenlee had probable cause, let alone any cause, to arrest for battery on an officer prior to the time he entered the home. *Compare Santana*, 389 U.S. at 42-43 (police could follow suspect standing at her doorway into her home where police had cause to arrest the suspect, because the "hot pursuit" exception justified their warrantless entry into the home).

19

immunity if the mistaken belief was reasonable.  *See Holland v. Harrington*, 268 F.3d 1179, 1196

(10th Cir. 2001).  "A mistake of law may be 'reasonable' where the circumstances 'disclose

substantial grounds for the officer to have concluded he [or she] had legitimate justification under

the law for acting as he [or she] did.'"  *Id.* at 1196 (quoting *Saucier*, 533 U.S. at 208).  The Tenth

Circuit has held that for a right to be "particularized," there "ordinarily . . . must be a Supreme

Court or Tenth Circuit opinion on point."  *Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir.

1996).  That is not to say, however, that "the very action in question [must have] previously been

held unlawful" for a plaintiff to defeat qualified immunity, *Anderson v. Creighton*, 483 U.S. 635,

640 (1987), but rather that in light of preexisting law, the unlawfulness was apparent.

It is well settled that the physical act of crossing the threshold of a home without consent,

a legally valid reason, exigent circumstances, or a warrant constitutes an unlawful search in

violation of the Fourth Amendment.  *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 576 (1980)

("In terms that apply equally to seizures of property and to seizures of persons, the Fourth

Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances,

that threshold may not reasonably be crossed without a warrant.")  The Court holds that on

August 27, 2000, it was clearly established that entering a home without consent or exigent

circumstances constitutes a violation of the Fourth Amendment.  The right to be free from a

search absent consent or other exceptions to the rule regarding warrantless searches was clearly

established as of this time in a  "particularized" and "relevant" sense:  "The contours of the right

[were] sufficiently clear that a reasonable official [in Defendant Greenlee's position] [should have]

underst[oo]d that what he [was] doing violate[d] that right.'"  *Saucier*, 533 U.S. at 201-02.  A

reasonable police officer should have clearly known that entering a residence, without consent

(and indeed with explicit instructions to remain outside) and with no exigent circumstances, violates the Fourth Amendment.

The Tenth Circuit's holding in *McKinnon* does not change the fact that it is clearly established that an overnight guest has a reasonable expectation of privacy inside of the home. *McKinnon* clearly applies to the reasonableness of a privacy expectation when one is standing "at" the doorway, with the door open, in plain view of officers. *McKinnon* does not alter long-standing and clearly established case law regarding a subject's privacy rights two to three feet inside of a doorway, facing away from the door, with a screen door separating the officer from the subject, when the subject has instructed the officer to remain outside. The Court therefore concludes that Plaintiff has satisfied her second burden of demonstrating that Defendant Greenlee's conduct violated clearly established law regarding unlawful searches. Accordingly, the Court denies Defendant Greenlee's motion for summary judgment on the ground of qualified immunity on Plaintiff's unlawful search claim.

  B.  <u>Defendant Hare</u>.

Defendant Hare also moves for summary judgment in his favor on the unlawful search claim, maintaining that no search occurred. The Court already has held that on the facts alleged by Plaintiff, Plaintiff has stated a constitutional violation for an unlawful search. On those same facts, however, there is no evidence that Defendant Hare was present for the search. There also is no evidence that Defendant Hare sanctioned or was otherwise involved in the search. Accordingly, the Court grants Defendant Hare's motion for summary judgment on Plaintiff's unlawful search claim.

II.     Section 1983 Fourth Amendment Unlawful Seizure Claim.

    A.     Defendant Greenlee.

        1.     Constitutional Violation.

Defendant Greenlee also contends that Plaintiff has not alleged facts stating an unlawful seizure because, even on Plaintiff's facts, Defendant Greenlee had probable cause to arrest Plaintiff.  The Court again must look to the substantive law in effect at the time the conduct in question occurred to determine whether Plaintiff has established a Fourth Amendment unlawful seizure claim based upon lack of probable cause.  *See Saucier v. Katz*, 533 U.S. 194, 199 (2001). "'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'" *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (quoting *Jones v. City & County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988)) (additional citations omitted); *United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991) (citation omitted).   "[A] court may determine whether probable cause existed at the time of the arrest by taking into account factors such as whether the officer reasonably interviewed witnesses readily available at the scene, whether he investigated basic evidence or whether he inquired if a crime had been committed at all before invoking the power of warrantless arrest and detention." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). "[N]one of these factors[, however,] is dispositive or indeed necessary to the inquiry." *Id.*

Defendant Greenlee maintains that he had probable cause to believe that Plaintiff had committed the crime of battery upon a peace officer.  Under New Mexico law, a person is guilty of the crime of battery upon a peace officer when he or she engages in "the unlawful, intentional

touching or application of force to the person of a peace officer while [the officer] is in the lawful

discharge of his [or her] duties, when done in a rude, insolent or angry manner."  N.M. Stat. Ann.

§ 30-22-24.  Whoever commits battery upon a peace officer is guilty of a fourth degree felony.

*Id.*

On the facts alleged by Plaintiff, it does not appear that Defendant Greenlee had probable

cause to arrest Plaintiff for the crime of battery upon a police officer because Defendant Greenlee

was  not "in the lawful discharge of his duties" when Plaintiff touched or applied force against

him.  Specifically, Defendant Greenlee was not lawfully inside of the residence when he pulled the

wallet away from Plaintiff.  Moreover, Defendants have not alleged that at the time Defendant

Greenlee took the wallet from Plaintiff that Plaintiff was engaged in a crime or otherwise doing

conduct that justified Defendant Greenlee's action in grabbing the wallet away from her.  Entering

a home without consent and applying force to the person of another for no legal reason is not

consistent with lawfully discharging one's duties.  The Court therefore holds that Plaintiff has

alleged facts sufficient to indicate that Defendant Greenlee was not in the lawful discharge of his

duties, and therefore that he did not have probable cause to arrest Plaintiff for battery upon a

peace officer.  Accordingly, Plaintiff has stated a constitutional violation.

Plaintiff also has stated a constitutional violation because, on the facts as alleged by her, it

does not appear that Plaintiff "unlawful[ly]" and "intentional[ly]" applied force against Defendant

Greenlee in a "rude, insolent or angry manner."  Plaintiff cites to evidence indicating that she did

not intend to apply force to Defendant Greenlee.  Plaintiff testified that she instinctively held onto

the wallet when Defendant Greenlee grabbed it from her, and that as a result, as Defendant

Greenlee pulled the wallet towards him, "[her] hands [went] with it, and [she] brushed his

shoulder."  Based upon these facts, a reasonable jury could find that Plaintiff did not unlawfully or intentionally apply force against Defendant Greenlee in a rude, insolent, or angry manner.

        2.    <u>Clearly Established</u>.

Plaintiff likewise has established her burden of demonstrating that Defendant Greenlee's conduct in arresting her without probable cause violated clearly established law.  A reasonable officer in Defendant Greenlee's position would have understood that arresting Plaintiff for the crime of battery on a peace officer without evidence that Plaintiff unlawfully and intentionally struck Defendant Greenlee (*i.e.*, evidence that Plaintiff possessed the requisite criminal intent) and without evidence that Defendant Greenlee was in the lawful discharge of his duties violates the right to be free from unlawful arrest.  *See Saucier*, 533 U.S. at 201-02.  It is a well-settled and long-standing principle that arrest without probable cause violates the Fourth Amendment.  *Cf. id.* at 208 (considering as part of its "clearly established" analysis whether the law in question was long standing).  Plaintiff therefore has satisfied both the first and second parts of her burden to overcome Defendants Greenlee's assertion of qualified immunity, and the Court denies Defendant Greenlee's motion for summary judgment on Plaintiff's unlawful arrest claim.

        B.    <u>Defendant Hare</u>.

Defendant Hare also moves for summary judgment in his favor on the unlawful seizure claim, maintaining that he was not present during the arrest of Plaintiff and did not participate in the decision to arrest Plaintiff.  In the alternative, Defendant Hare argues that if the Court finds that he was personally involved in the arrest, he is entitled to qualified immunity because he properly relied upon Defendant Greenlee's description of the events leading up to the arrest.

Although Defendant Hare was not involved in the initial decision to arrest Plaintiff,

Defendant Hare was personally involved in the decision to keep plaintiff detained and under arrest.  Defendant Hare also was involved with Plaintiff's detention at the Logan police station. In addition, Defendant Hare concedes that his name appears on documentation listing him as Plaintiff's arresting officer.   A factual question therefore exists with respect to whether Defendant Hare was involved in the arrest of Plaintiff.

Defendant Hare nonetheless maintains that he is entitled to summary judgment on the unlawful seizure claim because he is protected by qualified immunity.  The Court therefore must determine whether Plaintiff has stated a constitutional violation on the facts she has alleged.  In order to arrest Plaintiff, Defendant Hare was required to have probable cause to suspect that Plaintiff had committed the crime of battery on a police officer.  Defendant Greenlee reported to Defendant Hare that Plaintiff unlawfully touched him and committed a battery upon him. Defendant Greenlee informed Defendant Hare that he arrested Plaintiff for the crime of battery on a peace officer.  Plaintiff has alleged no specific facts indicating that Defendant Hare had reason to disbelieve Defendant Greenlee or that Defendant Hare's reliance upon Defendant Greenlee's statements was unreasonable.  Defendant Hare therefore had the right to rely upon the information relayed to him by Defendant Greenlee.  *Cf. Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995).  Because Plaintiff has not alleged facts sufficient to state a constitutional violation by Defendant Hare, the Court therefore grants Defendant Hare's motion for summary judgment on the unlawful seizure claim.

III.    <u>Section 1983 Fourth Amendment Excessive Force Claim</u>.

      A.    <u>Defendant Greenlee</u>.

            1.    <u>Constitutional Violation</u>.

The Court again must look to the substantive law in effect at the time the conduct in question occurred to determine whether Plaintiff has established a Fourth Amendment excessive force violation. *See Saucier*, 533 U.S. at 199.  In *Graham v. Connor*, decided in 1989, the Supreme Court held that the use of excessive force during arrest violates a person's Fourth Amendment right against unreasonable search and seizure and that all excessive force claims should be analyzed under the reasonableness standard of the Fourth Amendment. *See* 490 U.S. 386, 395 (1989).  The analysis set forth in *Graham* is still in effect today and therefore is the standard under which the Court must assess the officers' conduct. *See, e.g.*, *Saucier*, 533 U.S. at 202; *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001).

The Fourth Amendment reasonableness inquiry is objective and heavily fact dependent. *See, e.g.*, *Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1995).  It also recognizes that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, . . . [and it] must embody allowance for the fact that police officers are often forced to make split-second judgments . . .  in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97.  A court must pay careful attention to the totality of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resisting arrest by flight. *See id.* at 396 (citation omitted).

On the facts alleged by Plaintiff, after Defendant Greenlee informed her she was under arrest, she did not try to move away from him.  Defendant Greenlee nonetheless "immediately threw [her] down" to the ground and tried to handcuff her.  Thereafter, Plaintiff admits that she struggled on the ground with Defendant Greenlee in that she was "trying to get away from him as far as get upright, vertical, and off the floor."   When Defendant Greenlee got Plaintiff to stand up, Plaintiff testified that he handcuffed her and "drag[ged]" her out of the residence, down the steps, and down the street to his police vehicle, which was parked in front of Plaintiff's (and not her aunt's) house.  Plaintiff maintains that she was not struggling with Defendant Greenlee or otherwise resisting arrest as he dragged her "as fast as he could go" from her aunt's house to his vehicle in front of Plaintiff's house.

On the facts alleged by Plaintiff, Plaintiff has stated a violation of her right to be free from excessive force.  Physically throwing a subject to the ground when that subject has not attempted to flee or physically resisted arrest, and when the crime at issue is relatively minor (although battery on a peace officer admittedly can be a serious crime, brushing the shoulder of an officer as the officer for no lawful reason enters your home and grabs a wallet from your hand is not, on the scale of crimes, relatively serious) does not constitute a lawful use of force.  Although whether the suspect poses an immediate threat to the officer is a consideration, on the facts alleged by Plaintiff, it is clear that Plaintiff only brushed Defendant Greenlee's shoulder because he unlawfully grabbed a wallet from her hand and caused her hand to come towards him.  This application of force by Plaintiff does not render Defendant Greenlee's use of force against Plaintiff reasonable.

Moreover, on the facts alleged by Plaintiff, Plaintiff did not physically resist arrest after she

was handcuffed.  Defendant Greenlee nonetheless dragged a handcuffed and physically compliant individual out of the front door of her aunt's house and down the street to his police vehicle. Given that, on the facts alleged by Plaintiff, Plaintiff was not a threat to his safety or the safety of others, Plaintiff was not evading arrest at the time, and the crime was relatively minor, Defendant Greenlee's use of force was excessive.  The Court therefore holds that Plaintiff has satisfied the first part of her qualified immunity burden.

2.   <u>Clearly Established</u>.

Because the Court has held that the facts as alleged by Plaintiff establish a constitutional violation, the Court must consider next whether the right violated was clearly established.  The Court concludes that a reasonable officer in Defendant Greenlee's position would have understood that using physical force against a physically compliant and unthreatening individual who was not attempting to flee police custody at the time, without probable cause, violates that right.  It is a well-settled and long-standing principle that the use of force on an unarmed and unthreatening suspect constitutes unreasonable excessive force under the Fourth Amendment.  *Cf. Saucier*, 533 U.S. at 208 (considering as part of its "clearly established" analysis whether the law in question was long standing); *see also Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984) (a reasonable jury could conclude that officer used excessive force when slapping the handcuffed prisoner and pushing him against a wall); *Hung v. Watford*, No. 01-3580, 2002 U.S. Dist. LEXIS 23064, *18-19 (E.D. Pa. Dec. 3, 2002) ("[i]t is apparent that an unprovoked grab, punch, kick and handcuffing of an individual who is not resisting arrest . . . , not fleeing the scene of a crime and not engaging in any threatening activity . . . was clearly established as a violation of a constitutional right at the time of the incident") (unpublished decision).  Plaintiff therefore has

28

satisfied both the first and second parts of her burden to overcome Defendant Greenlee's assertion of qualified immunity.  Accordingly, the Court denies the motion for summary judgment on the excessive force claim against Defendant Greenlee.

      B.    <u>Defendant Hare</u>.

Defendant Hare also moves for summary judgment in his favor on Plaintiff's excessive force claim.  In response, Plaintiff cites to no specific facts indicating that Defendant Hare used any force, let alone excessive or unnecessary force, against Plaintiff.  Moreover, to the extent Plaintiff contends that Defendant Hare is liable for Defendant Greenlee's alleged use of excessive force, respondeat superior liability is not recognized as a valid theory of supervisory liability pursuant to Section 1983.  *Monell v. Dep't of Social Servs.*, 436 U.S. at 691.  Accordingly, the Court grants Defendant Hare's motion for summary judgment on Plaintiff's excessive force claim against him.

IV.    <u>Section 1983 Fourteenth Amendment Equal Protection Claim</u>.

Defendants maintain that they are entitled to summary judgment in their favor with respect to Plaintiff's Fourteenth Amendment equal protection claim based upon the failure to arrest Patrick Gutierrez and subsequent arrest of Plaintiff, because Plaintiff did not suffer any harm from Mr. Gutierrez as a result of the decision not to arrest Mr. Gutierrez.[6]  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons

---

      [6] Defendants also argue for the first time in their reply that they are entitled to qualified immunity with respect to Plaintiff's equal protection claim because their decision not to arrest Patrick Gutierrez was objectively reasonable under the circumstances.  The Court concludes that, on the facts construed in Plaintiff's favor, a reasonable jury could conclude that Defendants' decision was not objectively reasonable.

29

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  "An equal protection violation occurs when the government treats someone differently than another who is similarly situated" and there is no rational basis for the difference.  *Penrod v. Zavaras*, 94 F.3d 1399, 1406 (10th Cir. 1996) (citation omitted).[7]

In *Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir. 1998), a female victim of domestic violence brought an equal protection claim based upon alleged differential treatment against certain officers who failed to protect her from her abuser.  Defendants argue that in *Watson*, the victim suffered "harm . . . at the hands of the abusing spouse."  Here, Defendants maintain that the injuries Plaintiff alleges were not inflicted upon her by her spouse and were not proximately caused by any differential treatment that may have occurred because her spouse was a police officer.  Defendants therefore contend that Plaintiff's equal protection claim must be dismissed as a matter of law.

In *Watson*, the Tenth Circuit stated that a female victim of domestic violence bringing an equal protection claim based upon police conduct must "provide evidence that . . . she was injured by operation of the [police conduct]."  *Id.* at 694.  The *Watson* court did not indicate, however, that the injury must be inflicted by the spouse.  *See generally id.*  Moreover, Defendants cite to no case indicating that Plaintiff's injury must be inflicted by her spouse.  Indeed, in other equal protection contexts, the person(s) receiving differential, non-discriminatory treatment need not be the person(s) who inflicted injury upon the party discriminated against.  In those contexts, as here,

---

[7] If a plaintiff alleges violation of a fundamental right or discrimination against a suspect class, heightened scrutiny applies.  *See id.*

it is the party engaging in the differential treatment who causes injury to the plaintiff.  Defendants'

argument is not persuasive, and the Court denies their motion to summary judgment on Plaintiff's

equal protection claim.

V.    Section 1983 Municipal Liability Claims Against Defendants Town of Logan and Hare in
      his Official Capacity.

      A.    Policy or Custom.

Defendants Town of Logan and Hare in his official capacity[8] argue that they are entitled to

summary judgment on Plaintiff's supervisory and municipal liability claims on the ground that

Plaintiff cannot point to evidence demonstrating the existence of a policy or custom.  A

municipality such as the Town of Logan is not immune from a Section 1983 suit.  In *Monell v.*

*New York City Department of Social Services*, the Supreme Court held that municipalities and

other local governmental bodies are "persons" within the meaning of Section 1983.  *See* 436 U.S.

658, 689 (1978).  Although courts can impose civil liability on municipalities for their own illegal

acts, the Supreme Court repeatedly has refused to hold municipalities liable for the tortious acts of

their employees under a theory of *respondeat superior.  See, e.g.*, *id.*; *see also Barney v.*

*Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).  The Supreme Court has

concluded that municipalities (or actors in their official capacities) can be held liable only when an

injury is inflicted by the government's "'lawmakers or by those whose edicts or acts may fairly be

said to represent official policy.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988)

(quoting *Monell*, 436 U.S. at 694).  The Court explained that requiring a plaintiff to "[l]ocat[e] a

---

[8] In conducting its summary judgment evaluation, the Court will analyze Plaintiff's
municipal and official capacity claims together because under the law "an official-capacity suit is
in all respects, other than name, . . . a suit against the entity.'"  *Kentucky v. Graham*, 473 U.S.
159, 165-66 (1985).

'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citation omitted).  If an alleged violation "cannot be characterized as official policy then [a city] can still be held liable if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)); *see also Brown*, 520 U.S. at 403-04 ("Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.").  "In order to establish a custom, the actions must be 'persistent and widespread . . . practices of city officials.'" *Lankford*, 73 F.3d at 286 (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989)).

   1. <u>Treating Spouses of Police Officers Differently</u>.

  Defendants Town of Logan and Hare in his official capacity argue that Plaintiff has failed to allege facts sufficient to indicate that the Town of Logan has a policy or custom of treating spouses of police officers differently.  In response to this charge, Plaintiff has failed to point to any official policy of the Town of Logan to treat spouses of police officers differently from the officers or to treat officers different from the general public.  In addition, Plaintiff has identified no persistent or widespread custom of city officials to treat police officers differently from their spouses or the public.  Plaintiff therefore has failed to satisfy her summary judgment burden of coming forward with specific facts to indicate the existence of a policy or custom of treating spouses of police officers differently.  By identifying facts regarding only a single incident,

Plaintiff has not demonstrated the existence of a persistent and widespread practice and therefore has not established a custom of treating spouses of police officers differently. *Cf.*, *e.g.*, *Starrett*, 876 F.2d at 820 ("isolated and sporadic acts of sexual harassment directed at a few specific female members of [the] staff" does not amount to a "persistent and widespread practice"); *Watson*, 857 F.2d at 695 ("normally, a plaintiff must point to facts outside the plaintiff's own case to support the allegation of an unconstitutional municipal policy") (citation omitted). Accordingly, the Court grants Defendants Town of Logan and Hare in his official capacity's motion for summary judgment on Plaintiff's supervisory and municipal liability claims to the extent those claims are based upon Defendants' alleged differential treatment.

2.   <u>Inadequate Supervision, Unlawful Arrest, and Excessive Force</u>.

Although it is unclear whether Plaintiff's supervisory and municipal liability claims against Defendants Town of Logan and Hare in his official capacity extend beyond their alleged differential treatment, to the extent that Plaintiff also alleges that Defendants Town of Logan and Hare in his official capacity are liable for failure to adequately supervise Defendant Greenlee or for instituting policies or customs related to unlawful arrest or excessive force, the Court concludes that Defendants Town of Logan and Hare in his official capacity also are entitled to summary judgment in their favor on these claims. In response to the motion for summary judgment on the municipal liability claim, Plaintiff failed to point to any specific evidence demonstrating the existence of a formal policy or widespread and persistent custom related to inadequate supervision, unlawful arrest, or excessive force. Accordingly, the Court grants Plaintiff's motion for summary judgment on these municipal liability claims.

B.    Deliberate Indifference.

Defendants also move for summary judgment on Plaintiff's municipal liability claims on the ground that Plaintiff cannot point to evidence demonstrating deliberate indifference on the part of city officials.  To establish deliberate indifference, Plaintiff must establish that a city official acted with deliberate indifference towards the city's citizens or that the official had actual or constructive notice that his or her action or failure to act was substantially certain to result in a constitutional violation.  *Cf. Barney*, 143 F.3d at 1307.  Because the Court grants Defendants' motion for summary judgment on the ground that Plaintiff has failed to point to evidence indicating a policy or custom, the Court declines to consider Defendants' additional argument that Plaintiff has not pointed to evidence demonstrating deliberate indifference.

**CONCLUSION**

For the reasons stated above, **IT THEREFORE IS ORDERED** that Defendants' Motion and Memorandum in Support of Motion for Summary Judgment, filed July 6, 2005 **[Doc. No. 48]**, is GRANTED IN PART as follows:

(1) The Court denies Defendant Greenlee's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment unlawful search claim;

(2)  The Court grants Defendant Hare's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment unlawful search claim;

(3) The Court denies Defendant Greenlee's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment unlawful seizure claim;

(4)  The Court grants Defendant Hare's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment unlawful seizure claim;

(5) The Court denies Defendant Greenlee's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment excessive force claim;

(6)  The Court grants Defendant Hare's motion for summary judgment in his individual capacity on Plaintiff's Fourth Amendment excessive force claim;

(7)  The Court denies Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment equal protection claim on the ground that Plaintiff has failed to point to evidence indicating that she was harmed by her spouse; and

(8)  The Court grants Defendants Town of Logan and Hare in his official capacity's motion for summary judgment on Plaintiff's municipal liability claims.

Dated this 5th day of July 2006.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE